**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| **EXECUTIVE RISK SPECIALTY INSURANCE** | : | |
| **COMPANY** | : | CASE NO: |
| 15 Mountainview Road, | : | |
| Warren, New Jersey 07059 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **BLUE CROSS AND BLUE SHIELD** | : | |
| **OF FLORIDA, INC.** | : | |
| 4800 Deerwood Campus Parkway | : | |
| Jacksonville, Florida 32246 | : | |
| | : | |
| Defendant | : | |

**EXECUTIVE RISK SPECIALTY INSURANCE COMPANY'S**
**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff, Executive Risk Specialty Insurance Company ("**ERSIC**"), by and through its

counsel, and pursuant to 28 U.S.C. § 2201, brings this complaint for declaratory judgment in its

favor and against defendant, Blue Cross and Blue Shield of Florida, Inc. ("**BCBS of Florida**"),

as more fully described below:

**NATURE OF THE CASE**

1.     This is an insurance coverage dispute.   ERSIC seeks a declaration of non-

coverage from this Court in connection with BCBS of Florida's request for insurance arising

from three related lawsuits -- two national class actions and one state individual action -- brought

by health care providers against BCBS of Florida and other managed care organizations

("MCOs"). Those lawsuits, captioned (1) *Kenneth Thomas, M.D., et al. v. Blue Cross and Blue Shield Association, et al.,* ("*Thomas*"),[1] (2) *Dr. Jeffrey Solomon, et al. v. Blue Cross and Blue Shield Association, et al.* ("*Solomon*"), and (3) *Charles Stein, M.D., P.A. v. Blue Cross and Blue Shield of Florida* ("*Stein*")(collectively, the **"Provider Actions"**), alleged, *inter alia*, that BCBS of Florida breached its contractual obligations and otherwise withheld, delayed and reduced payments owed to providers for services rendered in violation of the Racketeer Influenced Corrupt Organization Act (**"RICO"**).

2.     Indeed, in the Provider Actions, some 900,000 doctors and health care providers across the country alleged that BCBS of Florida and other MCOs systematically underpaid providers for the medically-necessary services they rendered to patients. The MCOs allegedly did so by manipulating the process through which physicians were paid by combining, reducing, and editing the bills providers submitted for payment, thus withholding from them money to which they were entitled. Now, after entering into a proposed settlement to pay that money back to the providers from whom it was allegedly kept, BCBS of Florida has asked ERSIC to indemnify its purported misconduct and cover under the ERSIC Policy what is, by any name, restitution.

---

[1]   The *Thomas* class action was amended in late 2006 to, among other things, remove the first of the named class representatives, Dr. Kenneth Thomas, from that action. Thereafter, the lead plaintiff in that lawsuit became Dr. Rick Love. Thus, the *Thomas* lawsuit is now also known the *Love* lawsuit. However, since the litigation was known as *Thomas* since its inception in 2003 though late 2006, and was routinely referred to as *Thomas* in coverage letters and other communications by all parties and counsel, ERSIC continues to refer to that case as *Thomas* in this litigation.

3.      BCBS of Florida seeks coverage from ERSIC pursuant to its claims-made Managed Care Organization Errors and Omissions Liability Policy, no. 8167-7742, issued for the November 1, 2002 through November 1, 2003 policy period (the "**ERSIC Policy**"). BCBS of Florida's request for insurance is divided into two parts.

4.      First BCBS of Florida seeks coverage under the ERSIC Policy for over $6.3 million in costs and expenses allegedly incurred in the defense of the Provider Actions. These expenses, which as reported to ERSIC precipitously increased some 700% in a one-month period in 2005 alone (from $670,000 to $4.8 million) purportedly include items that are clearly not covered under the ERSIC Policy, in whole or in part. By way of example, BCBS of Florida seeks coverage for:

> ➢ $144,698.17 in fees from BCBS of Florida's *insurance coverage counsel*, McCarter & English, LLP;
> ➢ $1,530,545.53 in BCBS of Florida *employee salaries*; and
> ➢ $1,699,716.55 for computer hardware and software *upgrades* that added value to BCBS of Florida's "IT Infrastructure" and are considered *capital improvements*.

In addition, BCBS of Florida has not provided critical information regarding the millions of dollars of costs and expenses that it has presented to ERSIC for coverage, despite its burden to do so and ERSIC's repeated requests.

5.      Second, BCBS of Florida seeks coverage under the ERSIC Policy for its allocable share -- $10,426,119, plus administration costs -- of the proposed $177 million settlement of the *Thomas* lawsuit by several defendants, including BCBS of Florida, agreed to on April 27, 2007. That proposed settlement is subject to the approval of the U.S. District Court for the Southern District of Florida.

6.     Pursuant to the plain language of the ERSIC Policy, the Provider Actions constitute a single "**Claim**," subject to a single retention and a single $10 million policy limit of liability.[2]

7.     ERSIC timely responded to BCBS of Florida's request for coverage and reserved all of its rights under the ERSIC Policy.  Now, for the reasons that follow in this complaint, ERSIC seeks a declaration that BCBS of Florida's entire proposed settlement of the *Thomas* lawsuit, and most or all of the costs and expenses that have been submitted for coverage to ERSIC do not fall within the ERSIC Policy's Insuring Agreement, are not insurable "**Loss**," and/or are otherwise excluded from coverage by the ERSIC Policy.  The ERSIC Policy is attached hereto as Exhibit "**A**."

## THE PARTIES

8.     Plaintiff, ERSIC, is a Connecticut corporation with its principal place of business located in Warren, New Jersey.  ERSIC is an insurance company that issues, *inter alia*, primary and excess insurance policies to individuals and companies to guard against the risk of potential liability in connection with the insureds' performance of their professional obligations.

9.     Defendant, BCBS of Florida, is a Florida corporation with its principal place of business located in Jacksonville, Florida.  BCBS of Florida, its affiliates and subsidiaries provide health care services to approximately 5 million subscribers enrolled in various health care plans throughout the state of Florida.

---

[2]   Defined terms appear in boldface in the ERSIC Policy and are likewise set forth in bold in this complaint.

4

10.    In accordance with the terms, conditions and exclusions of the ERSIC Policy, ERSIC agreed to provide BCBS of Florida primary managed care errors and omission insurance coverage excess of the insured's retention for the November 1, 2002 through November 1, 2003 policy period.

## JURISDICTION & VENUE

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between ERSIC and BCBS of Florida and the matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars ($75,000.00).

12.    Venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391(a).

## THE PROVIDER ACTIONS

### *General Background of the Managed Care Industry*

13.    BCBS of Florida issues health care insurance policies to subscribers of its various managed care organizations.  It also enters into contractual arrangements with designated health care providers who treat BCBS of Florida subscribers, as well as agreements with organizations who hire BCBS of Florida to serve as administrator of self-funded third party health plans.

14.    Thus, generally speaking, BCBS of Florida is obligated to pay providers who perform covered medically-necessary services under one or more of four contractual arrangements.  These are: (1) provider fee-for-service contracts; (2) provider capitation (or lump sum) contracts; (3) third-party administration contracts; and (4) insurance contracts with BCBS

of Florida subscribers. These obligations sometimes overlap (*i.e.*, a provider may have a direct contract with BCBS of Florida and also provide services to a BCBS of Florida subscriber). Regardless, all of BCBS of Florida's payment obligations to providers for medically-necessary services rendered relate either to a direct contractual relationship with providers or BCBS of Florida's status as an insurer or health-plan administrator (or both).

15.    To be paid by BCBS of Florida, the providers must submit standard coded claim forms, most commonly the American Medical Association's HCFA/CMS-1500 universal-claim form, which requires providers to complete specific data fields in connection with BCBS of Florida's processing and review of the payment request.[3]

16.    The purpose of the coded information contained on the HCFA/CMS-1500 and other claim forms is to provide a uniform language that accurately describes the medical, surgical, and diagnostic services a doctor has rendered, and to give BCBS of Florida the information it needs to process a request for payment.

17.    Among other criteria, such as date of service and policy/contract information, the HCFA/CMS-1500 form incorporates the AMA's Current Procedural Terminology, or CPT coding procedures, which are copyrighted designations for various services performed by health care providers in the rendering of care to patients. These CPT Codes are submitted by providers to MCOs, such as BCBS of Florida, and then used by the MCOs to assign value for the services

---

[3]    HCFA is the acronym for the Health Care Financing Administration, the Federal agency that administered Medicare programs. This agency is now known as "The Centers for Medicare & Medicaid Services." Use of the HCFA/CMS-1500 is required under Medicare, and it is widely accepted by private payers, including BCBS of Florida, as a preferred billing form for medical services.

provided. Simply put, CPT Codes are how providers get paid.

18.    The plaintiffs in the Provider Actions alleged that BCBS of Florida and the other MCO defendants manipulated these CPT Codes and the HCFA/CMS 1500 forms submitted by providers in order to delay, reduce and withhold the payments owed to providers for services rendered to patients for the defendants' own financial benefit.

19.    The provider plaintiffs further stated that BCBS of Florida's alleged manipulation of these CPT Codes was a breach of contract that resulted in BCBS of Florida's unjust financial gain. In short, the Provider Actions sought to compel BCBS of Florida to give that money back.

### *The Stein Litigation*

20.    On May 13, 2003, Charles Stein, a healthcare provider, filed a lawsuit against BCBS of Florida captioned *Charles Stein, M.D. v. Blue Cross and Blue Shield of Florida* -- Volusia County (Florida) Circuit Court, No. 2003-30726. In general, *Stein* alleged that BCBS of Florida denied, delayed, and diminished payments owed to Dr. Stein for medical services he rendered to BCBS of Florida's subscribers by, among other things, combining the CPT codes of two or more procedures into one ("bundling"), changing the CPT code assigned to a particular service to a less expensive one ("downcoding"), and using automated software and cost-based criteria unrelated to medical necessity to deny valid requests for payment.

21.    The *Stein* Complaint also alleged that BCBS of Florida participated in a conspiracy and "enterprise" with other health insurance companies and various third party entities in violation of Florida's anti-racketeering statute. F.S.A § 895.02(1) *et seq.*

22.    The *Stein* Complaint alleged counts against BCBS of Florida for: (1) violation of F.S.A §

895.03; (2) breach of contract; and (3) unjust enrichment.

<u>*The Thomas and Solomon Class Actions*</u>

23.    The allegations against BCBS of Florida in the *Stein* litigation were revisited on a

national level in two class actions filed by providers in the Southern District of Florida in May

and November 2003:    (1) *Kenneth Thomas, M.D., et al.   v. Blue Cross and Blue Shield*

*Association, et al.,* 03-21296; and (2) *Dr. Jeffrey Solomon, et al. v. Blue Cross and Blue Shield*

*Association, et al.* 03-22935.

24.    Like *Stein*, the provider plaintiffs in *Thomas* and *Solomon* alleged that BCBS of

Florida engaged in a pattern of racketeering and conspiracy to manipulate CPT codes  in an effort to deny,

delay and reduce payments owed to the physician/providers for medical services rendered to patients.

25.    The providers in *Thomas* and *Solomon* further alleged that BCBS of Florida and the other

MCOs named as defendants in those cases improperly "downcoded" or "bundled" requests for payment,

used automated software and cost-based criteria unrelated to medical necessity to deny claims submitted

by providers, undervalued the basis for payments under capitated provider agreements, and otherwise

denied or delayed valid claims to its own financial benefit.

26.    The putative classes in *Thomas* and *Solomon* consist of physicians and other health care

providers who provided medical services to any patient insured by, or who was a member or beneficiary of

any plan administered by, any of the several managed care defendants in those cases.  At various times in

each litigation, both class actions also included two putative sub-classes: a National Non-Arbitration

Subclass and a National Non-Contract Subclass.  The putative classes differed only in the years to which

they purported to apply -- *Thomas* (1999 through certification); *Solomon* (1993 through certification) -- and the fact that the *Thomas* class was limited to physicians and physician groups, while the *Solomon* class extended to other types of health care providers (*e.g.*, podiatrists, chiropractors, etc.).

27.     In its current form, the *Thomas* Complaint has three counts:  Count I -- RICO conspiracy; Count II -- RICO aiding and abetting; and Count III -- Declaratory and injunctive relief under RICO.

28.     In its current form, the *Solomon* Complaint has six counts:  Count I -- RICO conspiracy; Count II -- RICO aiding and abetting; Count III -- unlawful use of RICO income; Count IV -- Declaratory and injunctive relief under RICO; Count V -- breach of contract; and Count VI -- unjust enrichment.

29.     The providers in both *Thomas* and *Solomon* sought the return of the money allegedly owed to them, treble damages under RICO, and other declaratory and injunctive relief.

## THE INSURANCE CLAIM & DISPUTE

30.     BCBS of Florida alleges that it has incurred over $6.3 million in legal fees and expenses in its defense of the Provider Actions.

31.     BCBS did not seek ERSIC's prior consent before incurring the majority of these expenses as required by the ERSIC Policy, and despite ERSIC's repeated requests, has not provided ERSIC with sufficient documentation regarding the reasonableness or necessity of these defense costs and expenses.  Indeed, many of theses "expenses" appear to include capital improvements independent of the defense of the Provider Actions that fall outside the definition of **"Defense Expenses"** that are potentially covered by the ERSIC Policy.  By way of example, BCBS of Florida has submitted for coverage some $1.6 million worth of computer hardware and software upgrades without any documentary support that the Provider Actions necessitated these

infrastructure improvements and without accounting for the competitive benefit BCBS of Florida would receive from these additions to its corporate capabilities. In addition, BCBS of Florida has submitted for coverage some $335,812.50 of apparent overhead expenses without any sufficient explanation regarding what they encompass and how they are related to the Provider Actions.

32.     On April 27, 2007, BCBS of Florida and other defendants reached a settlement with the providers in *Thomas*. That settlement is pending review and approval by the Southern District of Florida. The settling defendants in *Thomas* agreed to reimburse the provider plaintiffs $128 million and to pay plaintiffs' class counsel fees not to exceed $49 million. BCBS of Florida's allocable share of the proposed *Thomas* settlement is $10,426,119, plus administration costs.

33.     BCBS of Florida has asserted a right to coverage under the ERSIC policy for its defense of the Provider Actions, as well as for indemnity for its proposed settlement of the *Thomas* lawsuit. As of the date of this complaint, it is ERSIC's understanding that BCBS of Florida's request for insurance is approximately $7 million (taking into account the insured's retention and coinsurance provisions).

34.     A plain reading of the unambiguous ERSIC Policy shows that coverage is not available for BCBS of Florida's request for insurance related to the Provider Actions.

35.     The issues raised herein will directly govern the parties' rights and obligations, if any, under the ERSIC Policy. This matter is, therefore, ripe for adjudication.

## APPLICABLE POLICY PROVISIONS

36.     The ERSIC Policy is a claims-made policy, covering only insurable non-excluded "**Loss**" incurred by BCBS of Florida relating to a covered "**Claim**" made or deemed to be made during the November 1, 2002 to November 1, 2003 policy period.   Specifically, the ERSIC Policy's Insuring Agreement provides that:

> The Underwriter will pay on behalf of any **Insured** any **Loss** which the **Insured** is legally obligated to pay as a result of any **Claim** that is first made against the Insured during the **Policy Period** or during any applicable Extended Reporting Period.  As part of and subject to the Limit of Liability stated in Item 3(a) of the Declarations, the Underwriter will have the right and duty to defend any **Claim** made against any **Insured** which is covered by the Policy, even if the allegations of such **Claim** are groundless, false or fraudulent.

See ERSIC Policy at ¶ I (emphasis in original).

37.     The ERSIC Policy has a $10 million maximum aggregate limit of liability for all "**Loss**, including **Defense Expenses**, resulting from all **Claims** for which th[e] Policy provides coverage, regardless of the number of **Claims**, the number of persons or entities included within the definition of **Insured**, or the number of claimants." See id. ¶IV(A) & Declarations 3(a).

38.     With respect to **Class Action Claims**, BCBS of Florida's retention is $3 million for each **Class Action Claim**, inclusive of covered **Defense Expenses**.  See id. at End't 23, ¶4.

39.     The Policy defines **Class Action Claim**, as any **Claim**:

    (a)    brought or filed originally as, or amended at any time seeking certification as a class action whether or not such action is actually certified; or

    (b)    brought by or on behalf of any association or group, including but not limited to, societies, trade groups, professional groups, consumer advocates or advocacy groups, whether such **Claim** is brought in the name of such association or group or by such

association or group on behalf of one or more constituent individual(s) or entity(ies).

See id. at End't 23, ¶ 5.

40.     The ERSIC Policy provides, with respect to **Class Action Claims**, that:

> At such time that the retention amount set forth in paragraph (4) of this endorsement [i.e., $3 million], which shall be borne by the **Insureds** uninsured and at their own risk, has been satisfied, the Underwriter shall pay on behalf of the **Insured** the **Covered Percentage**, as defined in paragraph (2) of this endorsement, of **Loss**, including **Defense Expenses**, from each **Class Action Claim** first made against an **Insured** during the **Policy Period**, or if applicable, the Extended Reporting Period. Any amount of **Loss**, including **Defense Expenses**, in excess of the **Covered Percentage** shall be borne by the Insureds uninsured and at their own risk (the "**Insured's Percentage**").

See id. at End't 23, ¶1.

41.     Paragraph 2 of the Class Action Claims Endorsement provides that "[t]he term '**Covered Percentage**' means fifty percent (50%)." Id. at End't 23, ¶ 2.

42.     The ERSIC Policy further provides that:

> All **Related Claims**, whenever made, shall be deemed to be a single **Claim** and shall be deemed to have been made on the earliest of the following dates:
>
> (1)     the date on which the earliest **Claim** within such **Related Claims** was received by an **Insured**; or
>
> (2)     the date on which written notice was first given to the Underwriter of a **Wrongful Act** which subsequently gave rise to any of the **Related Claims**, regardless of the number and identity of claimants, the number and Identity of **Insureds** involved, or the number and timing of the **Related Claims**, even if the **Related Claims** comprising such single **Claim** were made in more than one **Policy Period**.

Id. ¶ IV(C).

43.     The term **Related Claims** is defined to mean "all **Claims** for **Wrongful Acts** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally or in any other way." Id. ¶ II(Q).

44.     Given that the *Stein, Thomas* and *Solomon* lawsuits all arise from and involve the same or related series of facts and circumstances -- *i.e.*, the alleged denial and delay of money owed to providers for services rendered -- the Provider Actions constitute a single **Claim**, subject to one $10 million limit of liability and a single retention.  In addition, given that *Thomas* and *Solomon* are **Class Action Claims**, even if BCBS of Florida is entitled to any coverage, ERSIC would only be obligated to pay 50% of the settlement or judgment in those cases, and 50% of covered, non-excluded **Defense Expenses**, excess of BCBS of Florida's $3 million retention.

45.     The ERSIC Policy defines **Loss** as "**Defense Expenses** and any monetary amount which an **Insured** is legally obligated pay as a result of a **Claim**." Id. ¶ II(J).

46.     **Loss** includes "up to the limit listed in ITEM 3(c) of the Declarations (which sum shall be part of and not in addition to the Limit of Liability stated in ITEM 3(a) of the Declarations), any punitive, exemplary or multiplied damages awarded in any civil proceeding, but only where insurable under applicable law." Id. ¶ II(J) & End't 8.

47.     **Loss** expressly does not include:

  (1) except as expressly set forth above, fines, penalties, and taxes;

> (2)     fees, amounts, benefits or coverage owed under any contract, health care plan or trust, insurance or workers' compensation policy or plan or program of self insurance;
>
> (3)     non monetary relief or redress in any form, including without limitation, the cost of complying with any injunctive, declaratory or administrative relief; or
>
> (4)     matters which are uninsurable under applicable law.

Id. ¶ II(J)(1)-(4) & End't 8.

48.     **Claim** is defined as:

> any written notice received by the risk management department or the corporate legal department of the Named Insured [BCBS of Florida] that a person or entity intends to hold an Insured responsible for a Wrongful Act.  In clarification and not in limitation of the foregoing, such notice may be in the form of an arbitration, mediation, judicial, declaratory or injunctive proceeding.  A Claim will be deemed to be made when such written notice is first received by the risk management department or the corporate legal department of the Named Insured.

Id. at End't 13.

49.     **Wrongful Acts** include "any actual or alleged act, error, or omission in the performance of, or any failure to perform, a **Managed Care Activity** by any **Insured Entity** or by any **Insured Person** acting within his or her duties or capacity as such." Id. at ¶ II(V)(1); see also ¶ II(K), as amended by End't 9 & 17 (definition of "**Managed Care Activity**").

50.     **Defense Expenses** are defined by the ERSIC Policy as "reasonable legal fees and expenses incurred in the investigation, defense or appeal of a **Claim**; provided that **Defense Expenses** shall not include remuneration, salaries, overhead, fees or benefit expenses of any **Insured**." Id. ¶II(E).

14

51.    "**Defense Expenses** are part of and not in addition to [ERSIC's] Limit of Liability, and payment of **Defense Expenses** by [ERSIC] will reduce its Limit of Liability." See id. ¶IV(2) & End't 23.

52.    In addition, the ERSIC Policy requires that BCBS of Florida must receive ERSIC's written consent before incurring any such **Defense Expenses**, providing:

> No **Insured** may incur **Defense Expenses** or admit liability for or settle any **Claim** without the Underwriters written consent. The Underwriter will have the right to make investigations and conduct negotiations and, with the consent of the **Insureds**, enter into such settlement of **Claims** as the Underwriter deems appropriate . . . .

See id. ¶IV(D)(1).

53.    The ERSIC Policy also excludes certain events and circumstances from coverage. For example, the ERSIC Policy provides:

> Except for **Defense Expenses**, the Underwriter shall not pay **Loss** from any **Claim** brought about or contributed to in fact by:
>
> (1)    any willful misconduct or dishonest, fraudulent, criminal or malicious act, error or omission by any **Insured**;
> (2)    any willful violation by any **Insured** of any law, statute, ordinance, rule or regulation; or
> (3)    any **Insured** gaining any profit, remuneration or advantage to which such Insured was not legally entitled.
>
> For purposes of determining the applicability of this Exclusion [], no **Wrongful Act** of any **Insured** shall be imputed to any other **Insured**.

Id. ¶ III(A)(1)-(3).

## COUNT I
## DECLARATORY JUDGMENT

54.    ERSIC incorporates the foregoing paragraphs as though fully set forth herein.

55.    BCBS of Florida's alleged misconduct as set forth in the Provider Actions is not covered and is excluded from coverage by the unambiguous terms, conditions and exclusions in the ERSIC Policy.  Thus, ERSIC seeks a declaration that BCBS of Florida's request for **Defense Expenses** related to the Provider Actions is not insured, in whole or in part, and that the proposed settlement of the *Thomas* lawsuit is not covered in its entirety.

56.    The Provider Actions alleged that BCBS of Florida breached its contractual obligations to providers, as well as its obligations as an insurer and third-party administrator, through its denial, delay and reduction of payments owed to providers for services rendered to patients.  Amounts owed under any contract or health care plan, or as insurance benefits, are not **Loss** as defined by the ERSIC Policy and therefore are not covered.

58.    Likewise, BCBS of Florida's proposed repayment of money it allegedly withheld from providers in the proposed *Thomas* settlement is uninsurable restitution or disgorgement, is not **Loss**, and is otherwise excluded from coverage.

59.    To the extent that BCBS of Florida's alleged misconduct in the Provider Actions was in fact intentional, fraudulent, or in willful violation of the law, such intentional, fraudulent and/or willful misconduct is not insured under the ERSIC Policy.

60.    The Provider Actions sought non-monetary and injunctive relief, and the *Thomas* settlement included non-monetary relief which is not **Loss**.  Therefore, BCBS of Florida's

16

request for insurance relating to such non-monetary and injunctive relief is not covered under the ERSIC Policy.

61.    Plaintiffs' attorneys' fees from the Provider Actions, which are included as an element in the *Thomas* settlement, are not related to an insured **Loss** and are not covered by the ERSIC Policy.

62.    BCBS of Florida's request for insurance is not covered and/or is excluded pursuant to the terms, conditions and exclusions of the ERSIC Policy and applicable endorsements.  ERSIC reserves its rights to raise additional coverage defenses to BCBS of Florida's insurance request in the future based on additional information.

63.    There are actual, bona fide and substantial issues in dispute between ERSIC and BCBS of Florida as to whether ERSIC owes a duty to indemnify BCBS of Florida for its defense, settlement and/or potential liability arising from the Provider Actions.

64.    This dispute between ERSIC and BCBS of Florida presents a real, immediate and justifiable controversy that requires adjudication by this Court.  A declaration of the proper interpretation of the ERSIC Policy is necessary to resolve the controversy between ERSIC and BCBS of Florida and settle any uncertainty as to the parties' rights and obligations, both with respect to the settled and unsettled Provider Actions.

65.    ERSIC is entitled to a judicial declaration that the ERSIC Policy does not cover and/or excludes BCBS of Florida's proposed settlement of the *Thomas* lawsuit.  In addition, ERSIC is entitled to a declaration that BCBS of Florida is not entitled to coverage for its costs and expenses allegedly incurred in the defense of the Provider Actions to the extent that such

costs and expenses are not reasonable or necessary **Defenses Expenses** as defined by the ERSIC Policy, or are otherwise excluded from coverage.

66.     There is no other form of proceeding that can provide ERSIC with the immediate declaratory judgment redress it seeks with respect to the aforementioned coverage dispute.

67.     Since declaratory judgment is both appropriate and necessary in light of the conflicting positions of the parties with respect to the ERSIC Policy and the obligations there under, ERSIC requests a judicial determination of the parties' respective rights and obligations in connection with the ERSIC Policy and Provider Actions.

WHEREFORE, pursuant to 28 U.S.C. § 2201 *et seq.*, plaintiff, Executive Risk Specialty Insurance Company requests that judgment be entered in its favor and against the defendant, BCBS of Florida, and asks this Court to:

A.     Determine, decide, adjudicate and declare the rights and liabilities of the parties with respect to the ERSIC Policy;

B.     Determine, decide, adjudicate and declare that there is no coverage for any of the claims asserted against BCBS of Florida in the Provider Actions or any other claims, notices of claims or potential claims reported or which could be reported in the future involving the same **Wrongful Act** or Related Acts under the ERSIC Policy;

C.     Determine, decide, adjudicate and declare that ERSIC has no obligation to advance and/or reimburse BCBS of Florida for any fees or costs incurred in connection with the defense of the Provider Actions or any other claims, notices of claims or potential claims reported or which could be reported in the future involving the same **Wrongful Act** or Related

Acts, except to the extent that such costs and expenses are reasonable and necessary **Defense Expenses** as defined by the ERSIC Policy and not otherwise excluded from coverage; and

D.     Award ERSIC all costs and expenses incurred in this matter, and to grant any such other and further relief that this Court deems just and proper.

Respectfully submitted,

Dated:  May 1, 2007

*Of Counsel*

Ronald P. Schiller
ronald.schiller@dlapiper.com
Daniel J. Layden
daniel.layden@dlapiper.com
**DLA PIPER US LLP**
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA  19103
(215) 656-3300
(215) 656-3301 (fax)

Philip V. Martino
philip.martino@dlapiper.com
Florida Bar No. 079189
Christina M. Burden
christina.burden@dlapiper.com
Florida Bar No. 0644951
**DLA PIPER US LLP**
101 East Kennedy Boulevard
Suite 200
Tampa, Florida 33602
(813) 229-2111
(813) 229-1447 (fax)

Attorneys for Executive Risk Specialty
Insurance Company

# EXHIBIT A

Executive Risk Specialty
Insurance Company

*Home Office:*
82 Hopmeadow Street
Simsbury, Connecticut 06070-7683



**POLICY NO.:**
8167-7742

## DECLARATIONS

### MANAGED CARE ORGANIZATION
### ERRORS AND OMISSIONS LIABILITY POLICY

**NOTICE: THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD," OR, ANY EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED, AND MAY BE EXHAUSTED, BY "DEFENSE EXPENSES," AND "DEFENSE EXPENSES" SHALL BE APPLIED AGAINST THE RETENTION. THE COVERAGE AFFORDED BY THIS POLICY DIFFERS IN SOME RESPECTS FROM THAT AFFORDED BY MOST OTHER POLICIES. PLEASE READ THE ENTIRE POLICY CAREFULLY.**

| | |
|---|---|
| **ITEM 1. NAMED INSURED** – Name and Principal Address:<br>BLUE CROSS & BLUE SHIELD OF FLORIDA<br>4800 DEARWOOD CAMPUS PARKWAY,<br>Panacea, FL 32346 | **ITEM 2. POLICY PERIOD:**<br><br>(a) Inception Date: November 1, 2002<br>(b) Expiration Date: November 1, 2003<br>Both dates at 12:01 a.m. at the Principal<br>Address stated in ITEM 1. |

**ITEM 3. LIMITS OF LIABILITY** (Subject to Condition IV(A) and inclusive of **Defense Expenses**):

(a) $10,000,000.00 Underwriter's maximum aggregate Limit of Liability for all **Claims** for which this Policy provides coverage.

(b) $10,000,000.00 Underwriter's maximum aggregate Limit of Liability for all **Claims** for **Antitrust Activity** for which this Policy provides coverage.

**ITEM 4. RETENTION** (Subject to Condition IV(A) and applicable to **Defense Expenses**):

$2,500,000.00 Each **Claim.**

**ITEM 5. PREMIUM:**

$1,300,000.00 Total premium for the **Policy Period.**

**ITEM 6. EXTENDED REPORTING OPTION(S):**

one year(s) at 100% of the Premium listed in ITEM 5.
three year(s) at 200% of the Premium listed in ITEM 5.

**ITEM 7. RETROACTIVE DATE:**
June 26, 1978

Catalog No. MCE&Od-S

| ITEM 8. | ALL CLAIM NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER MUST BE ADDRESSED TO: |
|---|---|
| | Vice President of Claims<br>Executive Risk Management Associates<br>P.O. Box 2002<br>Simsbury, CT  06070-7683 |

| ITEM 9. | POLICY FORM AND ENDORSEMENT EDITIONS ATTACHED AT ISSUANCE: | | |
|---|---|---|---|
| | B22671 (1/96 ed.) | D30315 (2/00 ed.) | QBCBSFL2 (2/01 ed.) |
| | D22668 (1/96 ed.) | D31217 (10/00 ed.) | QBCBSFL3 (2/01 ed.) |
| | D22985 (4/96 ed.) | D32239 (12/01 ed.) | QBCBSFL4 (2/01 ed.) |
| | D29082 (4/99 ed.) | D32360 (3/02 ed.) | QBCBSFL5 (2/01 ed.) |
| | D29417 (6/99 ed.) | D32483 (5/02 ed.) | QBCBSFL6 (3/01 ed.) |
| | D29492 (7/99 ed.) | QBCBSFL (2/01 ed.) | QBCBSFL7 (11/02 ed.) |

**These Declarations, the completed signed Application, and the Policy with any endorsements shall constitute the entire agreement between the Underwriter and the Insureds.**

| EXECUTIVE RISK SPECIALTY INSURANCE COMPANY<br>by (Authorized Company Representative):<br>November 21, 2002 |
|---|

All dollar amounts are shown in US Dollars



# Managed Care

Errors and Omissions Liability Policy

**Executive Risk Specialty Insurance Company**

*Home Office:*
82 Hopmeadow Street
Simsbury, Connecticut 06070-7683
Phone:  860.408.2000
Fax:  860.408.2002
Email:  csi-info@chubb.com
Web Site:  http://csi.chubb.com

**THIS IS A CLAIMS MADE POLICY WITH
DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.
PLEASE READ THE ENTIRE POLICY CAREFULLY.**

**EXECUTIVE RISK SPECIALTY INSURANCE COMPANY**

**MANAGED CARE ERRORS AND OMISSIONS LIABILITY POLICY**

**Executive Risk Specialty Insurance Company (the "Underwriter") and the Insureds, subject to all of the terms, conditions and limitations of this Policy and any endorsements thereto, agree as follows:**

**I.      INSURING AGREEMENT**

The Underwriter will pay on behalf of any **Insured** any **Loss** which the **Insured** is legally obligated to pay as a result of any **Claim** that is first made against the **Insured** during the **Policy Period** or during any applicable Extended Reporting Period.  As part of and subject to the Limit of Liability stated in ITEM 3(a) of the Declarations, the Underwriter will have the right and duty to defend any **Claim** made against any **Insured** which is covered by this Policy, even if the allegations of such **Claim** are groundless, false or fraudulent.

**II.     DEFINITIONS**

(A)     **"Antitrust Activity"** means any actual or alleged: price fixing; restraint of trade; monopolization; unfair trade practices; or violation of the Federal Trade Commission Act, the Sherman Act, the Clayton Act, or any other federal statute involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, or of any rules or regulations promulgated under or in connection with any of the foregoing statutes, or of any similar provision of any federal, state or local statute, rule or regulation or common law.

(B)     **"Application"** means the application attached to and forming part of this Policy, including any materials submitted and statements made in connection therewith, all of which are on file with the Underwriter and are a part of this Policy, as if physically attached.  If the **Application** uses terms or phrases that differ from terms defined in this Policy, no inconsistency between any term or phrase used in the **Application** and any term defined in this Policy will waive or change any of the terms, conditions and limitations of this Policy.

(C)   "**Claim**" means any written notice received by any **Insured** that a person or entity intends to hold an **Insured** responsible for a **Wrongful Act**. In clarification and not in limitation of the foregoing, such notice may be in the form of an arbitration, mediation, judicial, declaratory or injunctive proceeding. A **Claim** will be deemed to be made when such written notice is first received by any **Insured**.

(D)   "**Claim Services**" means the following services, but only if performed by an **Insured**: the submission, handling, investigation, payment or adjustment of claims for benefits or coverages under health care or workers' compensation plans.

(E)   "**Defense Expenses**" means reasonable legal fees and expenses incurred in the investigation, adjustment, defense or appeal of a **Claim**; provided, that **Defense Expenses** shall not include remuneration, salaries, overhead, fees or benefit expenses of any **Insured**.

(F)   "**Employment Practices**" means: (1) any failure or refusal to hire any person, any failure or refusal to promote any person, the demotion or discharge of any person, wrongful failure to grant tenure, or any limitation, segregation or classification of employees or applicants for employment in any way that would deprive or tend to deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee, because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, sexual orientation or preference, or other status that is protected pursuant to any applicable federal, state, or local statute or ordinance; (2) sexual advances, requests for sexual favors, or other verbal, visual, or physical conduct of a sexual nature that is made a condition of employment with the **Insured Entity**, is used as a basis for employment decisions with the **Insured Entity**, creates a work environment with the **Insured Entity** that interferes with performance, or creates an intimidating, hostile, or offensive working environment; workplace harassment (i.e., harassment of a non-sexual nature) which creates a work environment with the **Insured Entity** that interferes with performance, or creates an intimidating, hostile, or offensive working environment; (3) retaliatory treatment against an employee of the **Insured Entity** on account of such employee's exercise or attempted exercise of his or her rights under law; (4) employment-related: misrepresentation, defamation (including libel and slander), invasion of privacy, false imprisonment, wrongful discipline, wrongful deprivation of career opportunity or negligent hiring, evaluation, training, or supervision; (5) creation or administration of any employment-related benefits; or (6) the actual or constructive termination of the employment of, or demotion of, or failure or refusal to promote, any employee which is in violation of law or is against public policy, or breach of any contract or agreement relating to employment, whether arising out of any personnel manual, employee handbook, policy statement, or other representation.

(G)    **"Insured"** means any **Insured Entity** and any **Insured Person.**

(H)    **"Insured Entity"** means the **Named Insured** and any other entity designated on SCHEDULE A.

(I)    **"Insured Person"** means any past, present or future:

    (1)    employee, director, officer, trustee, member of the board of managers, governor or medical director of, or volunteer for, any **Insured Entity**; and

    (2)    member of, or provider of administrative support to, any review board or committee of any **Insured Entity**.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** in his or her capacity as such will be deemed to be a **Claim** against such **Insured Person.**

(J)    **"Loss"** means **Defense Expenses** and any monetary amount which an **Insured** is legally obligated to pay as a result of a **Claim**. **Loss** shall include, up to the amount listed in ITEM 3(b) of the Declarations (which sum shall be part of and not in addition to the Limit of Liability stated in ITEM 3(a) of the Declarations), any fines assessed, penalties imposed, or punitive, exemplary or multiplied damages awarded in **Claims** for **Antitrust Activity**, but only if such fines, penalties or punitive, exemplary or multiplied damages are insurable under applicable law. This paragraph shall be construed under the applicable law most favorable to the insurability of such fines, penalties, and punitive, exemplary or multiplied damages. **Loss** shall not include:

    (1)    except as expressly set forth above, fines, penalties, taxes, and punitive, exemplary or multiplied damages;

    (2)    fees, amounts, benefits or coverage owed under any contract, health care plan or trust, insurance or workers' compensation policy or plan or program of self-insurance;

    (3)    non-monetary relief or redress in any form, including without limitation the cost of complying with any injunctive, declaratory or administrative relief; or

    (4)    matters which are uninsurable under applicable law.

(K)    **"Managed Care Activity"** means any of the following services or activities: **Provider Selection; Utilization Review;** advertising, marketing, selling, or enrollment for health care or workers' compensation plans; **Claim Services;** establishing health care provider networks; reviewing the quality of **Medical Services** or providing quality assurance; design and/or implementation of financial incentive plans; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters or protocols; triage for payment of **Medical Services;** and services or activities performed in the administration or management of health care or workers' compensation plans.

(L)    **"Medical Information Protection"** means maintaining the confidentiality of information regarding **Medical Services** and limiting the release or use of such information in conformance with requirements of law.

(M)    **"Medical Services"** means health care, medical care, or treatment provided to any individual, including medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing or other professional health care; the use, prescription, furnishing or dispensing of medications, drugs, blood, blood products or medical, surgical, dental or psychiatric supplies, equipment or appliances in connection with such care; the furnishing of food or beverages in connection with such care; counseling or other social services in connection with such care; and the handling of, or the performance of post-mortem examinations on, human bodies.

(N)    **"Named Insured"** means the entity designated in ITEM 1 of the Declarations.

(O)    **"Policy Period"** means the period from the Inception Date of this Policy stated in ITEM 2(a) of the Declarations to the Expiration Date of this Policy stated in ITEM 2(b) of the Declarations, or to any earlier cancelation date of this Policy.

(P)    **"Provider Selection"** means any of the following, but only if performed by an **Insured:** evaluating, selecting, credentialing, contracting with or performing peer review of any provider of **Medical Services.**

(Q)    **"Related Claims"** means all **Claims** for **Wrongful Acts** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally or in any other way.

(R)    **"Sexual Activity"** means any conduct, physical acts, gestures or spoken or written words of a sexual nature, including without limitation sexual intimacy (even if consensual), sexual molestation, sexual assault, sexual battery, sexual abuse, sexual harassment, sexual exploitation or any sexual act.

(S)    **"Subsidiary"** means any entity during any time in which the **Named Insured**

owns or controls, directly or through one or more **Subsidiaries**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors or members of the board of managers.

(T)   **"Utilization Review"** means the process of evaluating the appropriateness, necessity or cost of **Medical Services** for purposes of determining whether payment or coverage for such **Medical Services** will be authorized or paid for under any health care plan, but only if performed by an **Insured**. In clarification and not in limitation of the foregoing, **Utilization Review** shall include prospective review of proposed payment or coverage for **Medical Services**, concurrent review of ongoing **Medical Services**, retrospective review of already rendered **Medical Services** or already incurred costs, disease management, and case management.

(U)   **"Vicarious Liability"** means liability attributed to any **Insured** for the acts of a person or entity other than an **Insured** via a theory of ostensible agency, apparent agency or respondeat superior.

(V)   **"Wrongful Act"** means:

   (1)   any actual or alleged act, error or omission in the performance of, or any failure to perform, a **Managed Care Activity** by any **Insured Entity** or by any **Insured Person** acting within the scope of his or her duties or capacity as such;

   (2)   any actual or alleged act, error or omission in the performance of, or any failure to perform, **Medical Information Protection** by any **Insured Entity** or by any **Insured Person** acting within the scope of his or her duties or capacity as such; and

   (3)   any **Vicarious Liability** for:

      (a)   the performance of, or any failure to perform:

         (i)   a **Managed Care Activity**;

         (ii)   **Medical Information Protection**;

      (b)   the rendering of, or failure to render, **Medical Services**; provided, that **Wrongful Act** shall not include any **Insured's** actual or alleged direct liability for the rendering of, or failure to render, **Medical Services**; or

(c) any actual or alleged **Sexual Activity**; provided, that **Wrongful Act** shall not include any **Insured's** actual or alleged direct liability for any **Sexual Activity**.

## III. EXCLUSIONS

(A) Except for **Defense Expenses**, the Underwriter shall not pay **Loss** from any **Claim** brought about or contributed to in fact by:

(1) any willful misconduct or dishonest, fraudulent, criminal or malicious act, error or omission by any **Insured**;

(2) any willful violation by any **Insured** of any law, statute, ordinance, rule or regulation; or

(3) any **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled.

For the purposes of determining the applicability of this EXCLUSION (A), no **Wrongful Act** of any **Insured** shall be imputed to any other **Insured**.

(B) No coverage will be available under this Policy for any actual or alleged act, error or omission by an **Insured** in the rendering of, or failure to render, **Medical Services**; provided, that this EXCLUSION (B) shall not apply to any portion of a **Claim** alleging, under statute, rule, regulation or common law tort, that the performance of any **Managed Care Activity** by an **Insured** constitutes the rendering of **Medical Services**.

(C) The Underwriter shall not pay any **Loss**, including **Defense Expenses**, from any **Claim**:

(1) based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(a) damage to, destruction of or loss of use of, any tangible property; or

(b) ownership, operation, use, maintenance, loading or unloading of any motor vehicle, trailer, watercraft, aircraft or helipad;

(2)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged bodily injury, sickness, disease or death of any employee of any **Insured** arising out of or in the course of employment by the **Insured**;

(3)     made by, on behalf of, or in the name or right of, or for the benefit of, any prospective, current or former owner of any legal or equitable interest in an **Insured Entity** in any form, including, but not limited to, stocks, shares, bonds, debentures, options, derivatives, partnership interests, limited liability company interests, any other form of debt or equity instruments or any other form of ownership interests, in connection with such owner's interest therein;

(4)     made by or on behalf of any federal, state or local governmental, regulatory or administrative agency, whether such **Claim** is brought in the name of such agency or by or on behalf of such agency in the name of any other individual or entity; provided, that this EXCLUSION (C)(4) shall not apply to any **Claim** for **Antitrust Activity**;

(5)     made by, on behalf of, or in the name or right of, or for the benefit of, any **Insured**; provided, that this EXCLUSION (C)(5) shall not apply to any **Claim** for **Provider Selection, Utilization Review** or **Claim Services** or to any **Claim** brought and maintained independently by an **Insured** in such **Insured's** capacity as a participant in a health care or workers' compensation plan administered or managed by the **Insured Entity**;

(6)     for any actual or alleged express or assumed liability of any **Insured** under an indemnification agreement; provided, that this EXCLUSION (C)(6) shall not apply to any tort liability that would have attached to the **Insured** in the absence of such agreement and is otherwise insured under this Policy;

(7)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

    (a)     failure to obtain, implement, effect, comply with, provide notice under or maintain any form, policy, plan or program of insurance, stop loss or provider excess coverage, reinsurance, self-insurance, suretyship or bond;

    (b)     commingling or mishandling of funds;

    (c)     failure to collect or pay premiums, commissions, brokerage charges, fees or taxes; or

    (d)    acts, errors or omissions in the brokering or underwriting of insurance policies or risks;

(8)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event, **Wrongful Act** or series of facts, circumstances, situations, transactions, events or **Wrongful Acts:**

    (a)    underlying or alleged in any litigation or administrative or regulatory proceeding brought prior to and/or pending as of the Inception Date stated in ITEM 2(a) of the Declarations:

        (i)    to which any **Insured** is or was a party; or

        (ii)    with respect to which any **Insured**, as of the Inception Date, knew or should reasonably have known that an **Insured** might be made a party thereto;

    (b)    which was the subject of any notice given prior to the Inception Date under any other policy of insurance or plan or program of self-insurance; or

    (c)    which was the subject of any **Claim** made prior to the Inception Date;

if, however, this Policy is a renewal of one or more policies previously issued by the Underwriter to the **Insured Entity**, and the coverage provided by the Underwriter to the **Insured Entity** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (C)(8) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Underwriter began to provide the **Insured Entity** with the continuous and uninterrupted coverage of which this Policy is a renewal;

(9)    against:

    (a)    any **Subsidiary;**

    (b)    any other entity acquired by the **Insured Entity**, whether by merger, consolidation, asset acquisition or otherwise; or

(c)      any **Insured Person** of any entity in (a) or (b) above;

for any **Wrongful Act** committed during any time in which such entity is not a **Subsidiary**, or at any time before any such acquisition by the **Insured Entity**; or

(10)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Employment Practices**; provided, that this EXCLUSION (C)(10) shall not apply to any **Claim** for **Provider Selection**, **Claim Services** or **Utilization Review**.

## IV.    CONDITIONS

### (A)    Limit of Liability, Retention:

(1)     The amount stated in ITEM 3(a) of the Declarations shall be the maximum aggregate Limit of Liability of the Underwriter for all **Loss**, including **Defense Expenses**, resulting from all **Claims** for which this Policy provides coverage, regardless of the number of **Claims**, the number of persons or entities included within the definition of **Insured**, or the number of claimants.

(2)     **Defense Expenses** are part of and not in addition to the Underwriter's Limit of Liability, and payment of **Defense Expenses** by the Underwriter will reduce its Limit of Liability.

(3)     The obligation of the Underwriter to pay **Loss**, including **Defense Expenses**, will only be in excess of the applicable retention set forth in ITEM 4 of the Declarations.  The Underwriter will have no obligation whatsoever, either to the **Insureds** or to any other person or entity, to pay all or any portion of any retention amount on behalf of any **Insured**, although the Underwriter will, at its sole discretion, have the right and option to do so, in which event the **Insureds** agree to repay the Underwriter any amounts so paid.

**(B)**     **Reporting of Claims and Circumstances:**

    (1)     If, during the **Policy Period** or any applicable Extended Reporting Period, any **Claim** is first made against any **Insured**, the **Insureds** must, as a condition precedent to any right to coverage under this Policy, give the Underwriter written notice of such **Claim** as soon as practicable thereafter and in no event later than:

        (a)     with respect to a **Claim** made during the **Policy Period**, ninety (90) days after the end of the **Policy Period**; or

        (b)     with respect to a **Claim** made during an Extended Reporting Period, ninety (90) days after such **Claim** is first made.

    (2)     If, during the **Policy Period**, an **Insured** first becomes aware of any **Wrongful Act** which may subsequently give rise to a **Claim**, and:

        (a)     gives the Underwriter written notice of such **Wrongful Act** with full particulars as soon as practicable thereafter but in any event before the end of the **Policy Period**; and

        (b)     requests coverage under this Policy for any **Claim** subsequently arising from such **Wrongful Act** as soon as practicable after such **Claim** is made;

    then any **Claim** subsequently made against the **Insured** arising out of such **Wrongful Act** shall, subject to CONDITION (C) below, be treated as if it had been first made during the **Policy Period**. The full particulars required in any notice given under (2)(a) above must include, without limitation, a description of the **Wrongful Act**, the identities of the potential claimants and involved **Insureds**, the injury or damages which have resulted and/or may result from such **Wrongful Act**, the manner in which the **Insured** first became aware of such **Wrongful Act**, and the reasons why the **Insured** believes the **Wrongful Act** is likely to result in a **Claim** being made.

**(C)**     **Related Claims Deemed Single Claim; Date Claim Made:**

All **Related Claims**, whenever made, shall be deemed to be a single **Claim** and shall be deemed to have been first made on the earliest of the following dates:

    (1)     the date on which the earliest **Claim** within such **Related Claims** was received by an **Insured**; or

(2)     the date on which written notice was first given to the Underwriter of a **Wrongful Act** which subsequently gave rise to any of the **Related Claims**, regardless of the number and identity of claimants, the number and identity of **Insureds** involved, or the number and timing of the **Related Claims**, even if the **Related Claims** comprising such single **Claim** were made in more than one **Policy Period**.

(D)   **Defense and Settlement:**

(1)     No **Insured** may incur any **Defense Expenses** or admit liability for or settle any **Claim** without the Underwriter's written consent.  The Underwriter will have the right to make investigations and conduct negotiations and, with the consent of the **Insureds**, enter into such settlement of any **Claim** as the Underwriter deems appropriate.  If the **Insureds** refuse to consent to a settlement acceptable to the claimant in accordance with the Underwriter's recommendation, then, subject to the Underwriter's maximum aggregate Limit of Liability set forth in ITEM 3(a) of the Declarations, the Underwriter's liability for such **Claim** will not exceed:

   (a)   the amount for which such **Claim** could have been settled by the Underwriter plus **Defense Expenses** up to the date the **Insureds** refused to settle such **Claim** (the "Settlement Amount"); plus

   (b)   fifty percent (50%) of any **Loss** and/or **Defense Expenses** in excess of the Settlement Amount incurred in connection with such **Claim**.  The remaining fifty percent (50%) of **Loss** and/or **Defense Expenses** in excess of the Settlement Amount will be carried by the **Insured** at its own risk and will be uninsured.

(2)     The Underwriter will have no obligation to pay **Loss**, including **Defense Expenses**, or to defend or continue to defend any **Claim** after the Underwriter's maximum aggregate Limit of Liability, as set forth in ITEM 3(a) of the Declarations, has been exhausted by the payment of **Loss**, including **Defense Expenses**.  If the Underwriter's maximum aggregate Limit of Liability, as set forth in ITEM 3(a) of the Declarations, is exhausted by the payment of **Loss**, including **Defense Expenses**, the premium will be fully earned.

**(E)**   **Assistance and Cooperation:**

In the event of a **Claim**, the **Insureds** shall provide the Underwriter with all information, assistance and cooperation that the Underwriter reasonably requests. At the Underwriter's request, the **Insureds** shall assist in investigating, defending and settling **Claims** and in the conduct of actions, suits, appeals or other proceedings, including but not limited to attending trials, hearings and depositions, securing and giving evidence, and obtaining the attendance of witnesses.

**(F)**   **Subrogation:**

In the event of any payment hereunder, the Underwriter shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insureds**. The **Insureds** shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Underwriter effectively to bring suit in their name. The **Insureds** shall do nothing that may prejudice the Underwriter's position or potential or actual rights of recovery. The obligations of the **Insureds** under this CONDITION (F) shall survive the cancelation or other termination of this Policy.

**(G)**   **Other Insurance; Other Indemnification:**

**(1)**   This Policy shall be excess of and shall not contribute with:

   **(a)**   any other existing insurance or self-insurance (whether collectible or not), unless such other insurance or self-insurance is specifically stated to be in excess of this Policy; and

   **(b)**   any indemnification to which an **Insured** is entitled from any entity other than another **Insured**.

This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance.

**(2)**   If any other policy or policies issued by the Underwriter or any of its affiliated companies, or by any predecessors or successors of the Underwriter or its affiliated companies, shall apply to any **Claim**, then the aggregate Limit of Liability with respect to all **Loss** under this Policy and all covered loss under such other policies shall not exceed the highest applicable Limit of Liability, subject to its applicable deductible or retention, that shall be available under any one of such policies, including this Policy. This CONDITION (G)(2) shall not apply with respect to any other policy which is written only as specific excess insurance over the Limit of Liability of this Policy.

(H)   **Mergers, Acquisitions, or Newly Created Entities:**

If, during the **Policy Period**, the **Named Insured** or any **Insured Entity** acquires or creates another entity or **Subsidiary** or becomes a member of a joint venture or general partner in a general partnership which is not designated on SCHEDULE A, or if the **Named Insured** or any **Insured Entity** merges or consolidates with another entity which is not designated on SCHEDULE A such that the **Named Insured** or **Insured Entity** is the surviving entity (any such acquired, created, merged or consolidated entity an "Acquired Entity"), then for a period of ninety (90) days after the effective date of the transaction, such Acquired Entity shall be included within the term "**Insured Entity**" with respect to **Wrongful Acts** committed or allegedly committed by the Acquired Entity or its **Insured Persons** after the effective date of the transaction.  Upon the expiration of the ninety (90) day period, there will be no coverage under this Policy for **Wrongful Acts** committed or allegedly committed by the Acquired Entity or its **Insured Persons** unless within the ninety (90) day period:

(1)   the **Named Insured** gives the Underwriter such information regarding the transaction as the Underwriter requests; and

(2)   the Underwriter has specifically agreed by written endorsement to this Policy to provide coverage with respect to such Acquired Entity and its **Insured Persons**, and the **Named Insured** accepts any terms, conditions, exclusions or limitations, including payment of additional premium, as the Underwriter, in its sole discretion, imposes in connection with the transaction.

(I)   **Sales or Dissolution of Insured Entities; Cessation of Business:**

(1)   If, during the **Policy Period**:

(a)   the **Named Insured** is dissolved, sold, acquired by, merged into or consolidated with another entity such that the **Named Insured** is not the surviving entity, or such that any person, entity or affiliated group of persons or entities obtains:

(i)   the right to elect or appoint more than fifty percent (50%) of the **Named Insured's** directors, trustees or member managers, as applicable; or

(ii)   more than fifty percent (50%) of the **Named Insured's** equity or assets;

(b)    the **Named Insured** ceases to do business for any reason; or

(c)    a receiver, liquidator, conservator, trustee, rehabilitator or similar administrator is appointed for the **Named Insured**;

then in any such event (any of which events is referred to in this CONDITION (I) as a "Material Event"), coverage under this Policy for all **Insureds** shall continue in full force and effect until the Expiration Date or any earlier cancelation date, but this Policy shall apply only to **Wrongful Acts** committed or allegedly committed before such Material Event. There will be no coverage under this Policy with respect to any **Claim** against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** committed or allegedly committed on or after the date of such Material Event.

(2)    If, during the **Policy Period**, any **Insured Entity** other than the **Named Insured** is involved in a Material Event, coverage under this Policy for **Wrongful Acts** committed or allegedly committed before such Material Event by such **Insured Entity** or its **Insured Persons** shall continue in full force and effect until the Expiration Date or any earlier cancelation date. There will be no coverage under this Policy with respect to any **Claim** against such **Insured Entity** or its **Insured Persons** based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any **Wrongful Act** of such **Insured Entity** or its **Insured Persons** committed or allegedly committed on or after the date of such Material Event. Coverage under this Policy shall continue in full force and effect for all other **Insureds**.

(J)    **Cancelation; Non-Renewal:**

(1)    The Underwriter may not cancel this Policy except for the **Named Insured's** failure to pay a premium when due, in which case twenty (20) days' written notice will be given to the **Named Insured** by the Underwriter.

(2)    The **Named Insured** may cancel this Policy prospectively only by mailing the Underwriter written notice stating when thereafter such cancelation shall be effective. In such event, the earned premium shall be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancelation is effective or as soon as practicable after cancelation becomes effective, but payment or tender of unearned premium is not a condition of cancelation.

(3)    The Underwriter will not be required to renew this Policy upon its expiration. The Underwriter will provide the **Named Insured** with sixty (60) days' notice of any non-renewal.

**(K)    Extended Reporting Periods:**

If this Policy is canceled for any reason other than non-payment of premium or is not renewed by the Underwriter or the **Named Insured**, an additional period of time during which **Claims** may be reported under this Policy (an "Extended Reporting Period") shall be made available as described in this CONDITION (K), but any such Extended Reporting Period shall apply only to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such cancelation or non-renewal ("Termination Date"). No Extended Reporting Period shall in any way increase the Underwriter's Limit of Liability as stated in ITEM 3(a) of the Declarations, and the Underwriter's maximum aggregate Limit of Liability for all **Loss** from all **Claims** first made during the **Policy Period** or any Extended Reporting Period shall not exceed the Limit of Liability stated in ITEM 3(a) of the Declarations. The offer of renewal terms, conditions, limits of liability, retentions or premium different from those in effect prior to renewal shall not constitute cancelation or refusal to renew for purposes of this CONDITION (K). The Extended Reporting Period will apply as follows:

(1)    An Extended Reporting Period of ninety (90) days, beginning as of the Termination Date, will apply automatically and requires no additional premium; provided, that such Extended Reporting Period will remain in effect only as long as no other policy of insurance is in effect that would apply to any **Claim** made during such Extended Reporting Period.

(2)    The **Named Insured** may purchase an additional Extended Reporting Period for the period of time stated in ITEM 6 of the Declarations by notifying the Underwriter in writing of its intention to do so no later than thirty (30) days after the Termination Date. The additional premium for this additional Extended Reporting Period shall be equal to the amount stated in ITEM 6 of the Declarations and must be paid no later than thirty (30) days after the Termination Date.

(3)    If the **Named Insured** and all **Insured Entities** cease all operations entirely during the **Policy Period**, the **Insureds** may, in lieu of the additional Extended Reporting Period described in CONDITION (K)(2) above, purchase an additional Extended Reporting Period for the period of six (6) years after the Termination Date by notifying the Underwriter in writing of their intention to do so no later than thirty (30) days after the Termination Date. The additional premium for this additional Extended Reporting Period shall be fifty percent (50%) of the total premium for the **Policy Period** stated in ITEM 5 of the Declarations and must be paid within thirty (30) days after

the Termination Date.  However, this Extended Reporting Period shall not be available if, as of or after the Termination Date, the **Named Insured** or any **Insured Entity** continues to perform any business operation (other than an operation required solely to effect any liquidation or dissolution which shall already have been commenced), or if any business operation of the **Named Insured** or any **Insured Entity** is being performed by any other person or entity who shall have acquired or succeeded to such operation or to any assets of the **Named Insured** or any **Insured Entity** by purchase, sale, merger, acquisition, consolidation or otherwise.

If no election to purchase an additional Extended Reporting Period is made as described in CONDITION (K)(2) or (K)(3) above or if the additional premium therefor is not paid within thirty (30) days after the Termination Date, there will be no right to purchase an additional Extended Reporting Period at any later time. Failure to elect to purchase an additional Extended Reporting Period or to pay the additional premium therefor will not affect the application of the automatic Extended Reporting Period described in CONDITION (K)(1) above.

(L)     **Representation; Incorporation of Application:**

The **Insureds** represent that the particulars and statements contained in the **Application** attached to this Policy are true, accurate and complete, and agree that:

(1)     this Policy is issued and continued in force by the Underwriter in reliance upon the truth of such representation;

(2)     those particulars and statements are the basis of this Policy; and

(3)     the **Application** and those particulars and statements are incorporated in and form a part of this Policy.

No knowledge or information possessed by any **Insured** shall be imputed to any other **Insured** for the purposes of this CONDITION (L), except for material facts or information known to the person or persons who signed the **Application**.  In the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the **Application**, this Policy shall be void with respect to any **Insured** who knew of such untruth, misrepresentation or omission, or to whom such knowledge is imputed.

(M)   **Action against Underwriter:**

(1)   No action shall be taken against the Underwriter by any **Insured** unless, as conditions precedent thereto, the **Insureds** have fully complied with all of the terms of this Policy and the amount of the **Insureds'** obligation to pay has been finally determined either by judgment against the **Insureds** after adjudicatory proceedings, or by written agreement of the **Insureds,** the claimant and the Underwriter.

(2)   No individual or entity shall have any right under this Policy to join the Underwriter as a party to any **Claim** to determine the liability of any **Insured**; nor shall the Underwriter be impleaded by an **Insured** or his, her or its legal representative in any such **Claim.**

(N)   **Insolvency of Insured:**

The Underwriter shall not be relieved of any of its obligations under this Policy by the bankruptcy or insolvency of any of the **Insureds** or any of their estates.

(O)   **Notice; Named Insured Authorization:**

(1)   Notice to any **Insured** shall be sent to the **Named Insured** at the address designated in ITEM 1 of the Declarations.  The **Insureds** agree that the **Named Insured** shall act on their behalf with respect to receiving any notices and any return premiums from the Underwriter.

(2)   Notice to the Underwriter shall be sent to the address designated in ITEM 8 of the Declarations.

(P)   **Changes:**

Notice to or knowledge possessed by any agent or other person acting on behalf of the Underwriter shall not effect a waiver or change in any part of this Policy or estop the Underwriter from asserting any right under this Policy.  This Policy can be altered, waived or changed only by written endorsement issued to form a part of this Policy.

(Q)   **Assignment:**

No assignment of interest under this Policy shall bind the Underwriter without its written consent issued as an endorsement to form a part of this Policy.

(R)     **Entire Agreement:**

The **Insureds** agree that this Policy, including the Application, Declarations and any endorsements, constitutes the entire agreement between them and the Underwriter or any of the Underwriter's agents relating to this insurance.

(S)     **Headings:**

The descriptions in the headings and sub-headings of this Policy are solely   for convenience, and form no part of the terms and conditions of coverage.

**In witness whereof, the Underwriter has caused this Policy to be executed on the Declarations Page.**

_Henry A Aubil_
        Secretary

                                                President

ENDORSEMENT NO. 1
SERVICE OF SUIT ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

Policy No.    8167-7742
Issued to     BLUE CROSS & BLUE SHIELD OF FLORIDA
Issued by     Executive Risk Specialty Insurance Company

In consideration of the premium charged, it is hereby understood and agreed that the following Condition is made part of this Policy:

SERVICE OF SUIT.
In the event of any failure by the Underwriter to pay any amount claimed to be due under this Policy, the Underwriter, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States.   This endorsement does not constitute and should not be understood to constitute an agreement by the Underwriter that any action, suit or proceeding is properly maintained in a specific forum, nor may it be construed as a waiver of the Underwriter's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or any state in the United States, all of which rights the Underwriter expressly reserves. It is further agreed that service of process in such suit may be made upon Senior Vice President, Claims, Executive Risk Specialty Insurance Company, 82 Hopmeadow Street, Simsbury, CT 06070 or his or her representative, and that in any suit instituted against the Underwriter upon this contract, the Underwriter will abide by the final decision of such court or of any appellate court in the event of any appeal.

Pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Underwriter hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose by statute, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above-named Senior Vice President as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Robert Hamburger_

_____
Authorized Representative

B22671 (1/96)                    Page 1

ENDORSEMENT NO. 2
POLLUTION, ASBESTOS, NUCLEAR EXCLUSION–BROAD ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

Policy No.      8167-7742
Issued to       BLUE CROSS & BLUE SHIELD OF FLORIDA
Issued by       Executive Risk Specialty Insurance Company

In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    (a)    any actual, alleged, or threatened, exposure to, generation, storage, transportation, discharge, emission, dispersal, escape, release, seepage, treatment, removal, disposal, processing, or handling of any solid, liquid, gaseous, or thermal irritant, pollutant, or contaminant, including without limitation smoke, vapors, soot, fumes, acids, alkalis, chemicals (toxic or otherwise), waste (infectious or otherwise), and medical and pharmaceutical supplies; or any regulation, order, direction, or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any of the foregoing; or any action taken in contemplation or anticipation of any such regulation, order, direction or request.

    (b)    any actual or alleged property damage, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish, or mental injury at any time arising out of or resulting from the manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers, or asbestos dust;

    (c)    any obligation of the Insured to indemnify any party for any actual or alleged property damage, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish, or mental injury at any time arising out of the manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust;

    (d)    any obligation of the Insured to defend any claim seeking damages for any actual or alleged property damage, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish, or mental injury at any time arising out of the manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers, or asbestos dust;

    (e)    any actual or alleged nuclear reaction, nuclear radiation, radioactive contamination, or radioactive substance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Robert Hamburger_

---
Authorized Representative

## ENDORSEMENT NO. 3
## SCHEDULE A – ADDITIONAL INSURED ENTITIES

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

| | |
|---|---|
| Policy No. | 8167-7742 |
| Issued to | BLUE CROSS & BLUE SHIELD OF FLORIDA |
| Issued by | Executive Risk Specialty Insurance Company |

In consideration of the premium charged, the term "Insured Entity" will also include the following:

Health Options, Inc.
Comp Options Insurance Co., Inc.
First Coast Health Services Options, Inc.
Principal Health Car of Florida, Inc.
Florida Combined Life Insurance Company, Inc.
Florida Combined Life Insurance Agency,Inc.
Health Options Diversified, Inc.
Navigy Holdings, Inc.
Navigy, Inc.
Diversified Services Options, Inc.
Diversified Health Services, Inc.
Capital Group Health Services of Florida, Inc.
Incepture, Inc
Health Options Connect, Inc.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Robert Hamburger_

_____
**Authorized Representative**

ENDORSEMENT NO. 4
PUNITIVE DAMAGES ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

| | |
|---|---|
| Policy No. | 8167-7742 |
| Issued to | BLUE CROSS & BLUE SHIELD OF FLORIDA |
| Issued by | Executive Risk Specialty Insurance Company |

In consideration of the premium charged, for the purpose of determining the insurability of punitive damages under Endorsement No. 12 of the Policy, the Underwriter and the Insured Persons agree that the law of the jurisdiction most favorable to the insurability of punitive damages shall control, provided such jurisdiction:

(a)     is where such punitive damages were awarded or imposed; or

(b)     is where the Named Insured or any Insured Entity is incorporated or otherwise organized or has a place of business; or

(c)     is where the Underwriter is incorporated or has its principle place of business; or

(d)     is where the parent company of the Underwriter is incorporated.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Robert Hamburger_

_____
Authorized Representative

**ENDORSEMENT NO. 5**
**EDP/COMPUTER SERVICES EXCLUSION ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

| | |
|---|---|
| Policy No. | 8167-7742 |
| Issued to | BLUE CROSS & BLUE SHIELD OF FLORIDA |
| Issued by | Executive Risk Specialty Insurance Company |

In consideration of the premium charged, no coverage will be available for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

(a) the design, manufacture, assembly, installation, modification or sale of any computer hardware, software or peripheral equipment or device, in whole or in part, by the Insured or by any entity owned by, controlled by or affiliated with the Insured through any common ownership;

(b) any electronic funds transfer, automated bank transaction or automated securities quotation or transaction, including any authentication or other services ancillary thereto;

(c) any breakdown or failure to perform, in whole or in part, of any computer hardware, software or peripheral equipment or device, including any breakdown, interruption or failure of any utility, telephone line, data transmission line or other infrastructure necessary for the operation of any computer hardware, software or peripheral equipment or device;

(d) the analysis, design, development, programming or any other aspect of providing electronic data processing, computer time-sharing or computer back-up services or facilities to third parties, including the rendering of advice, training or opinions to third parties with respect to electronic data processing, computer time-sharing or computer back-up services or facilities or any aspect thereof; or

(e) any introduction or alteration of any code, program or data causing any loss of access to or corruption or malfunction of any computer hardware, software, peripheral equipment or device or data, in whole or in part;

provided that, this Exclusion shall not apply to any Claim for Medical Information Protection, Provider Selection, Utilization Review or Claims Services if performed by an Insured.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Robert Hamburger_

_____
**Authorized Representative**

ENDORSEMENT NO. 6
AMEND DEFINITION OF "UTILIZATION REVIEW" ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

Policy No.     8167-7742
Issued to      BLUE CROSS & BLUE SHIELD OF FLORIDA
Issued by      Executive Risk Specialty Insurance Company

In consideration of the premium charged, the term "Utilization Review," as defined in Section II Definitions (T) of the Policy, is amended to include the following services or activities:

Triage Counseling

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative

D29492 (7/1999)                    Page 1

ENDORSEMENT NO. 7
AMEND EXCLUSION (C)(4) ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

Policy No.      8167-7742
Issued to       BLUE CROSS & BLUE SHIELD OF FLORIDA
Issued by       Executive Risk Specialty Insurance Company

In consideration of the premium charged, Section III Exclusions (C)(4) of the Policy shall not apply to any Claim for an individual enrollee benefit dispute in a Medicare, Medicaid, or other health plan sponsored by the state or federal government.

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative

**ENDORSEMENT NO. 8**
**AMEND DEFINITION OF "LOSS" TO INCLUDE PUNITIVE DAMAGES (WITH OR WITHOUT SUBLIMIT) ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

| | |
|---|---|
| Policy No. | 8167-7742 |
| Issued to | BLUE CROSS & BLUE SHIELD OF FLORIDA |
| Issued by | Executive Risk Specialty Insurance Company |

In consideration of the premium charged:

(1)   The term "Loss," as defined in Section II Definitions (J) of the Policy, is amended to include, up to the amount listed in ITEM 3(c) of the Declarations (which sum shall be part of and not in addition to the Limit of Liability stated in ITEM 3(a) of the Declarations), any punitive, exemplary or multiplied damages awarded in any civil proceeding, where insurable under applicable law.

(2)   Section II Definitions (J)(1) of the Policy is amended to read in its entirety as follows:

"(1)      except as expressly set forth above, fines, penalties and taxes;".

(3)   ITEM 3 of the Declarations is amended to include the following:

"ITEM 3(c)      $10,000,000.00 Underwriter's maximum aggregate Limit of Liability for all punitive, exemplary and multiplied damages."

(4)   Notwithstanding the above, the maximum Limit of Liability for any Claim for Antitrust Activity, including but not limited to punitive, exemplary or multiplied damages where insurable under applicable law, arising from any such Claim for Antitrust Activity, shall be the Limit of Liability noted in ITEM 3(b) of the Declarations and such amount shall be part of and not in addition to the Limit of Liability stated in ITEM 3(a) of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Robert Hamburger_

_____
Authorized Representative

ENDORSEMENT NO. 9
AMEND DEFINITION OF MANAGED CARE ACTIVITY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

| | |
|---|---|
| Policy No. | 8167-7742 |
| Issued to | BLUE CROSS & BLUE SHIELD OF FLORIDA |
| Issued by | Executive Risk Specialty Insurance Company |

In consideration of the premium charged, the term **"Managed Care Activity,"** as defined in Section II Definitions (K) of the Policy, is amended to read in its entirety as follows:

"(K)     **'Managed Care Activity'** means any of the following services or activities:

> " Provider Selection; Utilization Review; advertising, marketing, selling, or enrollment for health care, workers' compensation plans or life insurance plans; Claim Services; establishing health care provider networks; reviewing the quality of Medical Services or providing quality assurance; design and/or implementation of financial incentive plans; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters or protocols; triage for payment of Medical Services; Disease management; and services or activities performed in the administration or management of health care, workers' compensation plans or life insurance plans."
> "

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative

ENDORSEMENT NO. 10
AMEND WRONGFUL ACT ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

| | |
|---|---|
| Policy No. | 8167-7742 |
| Issued to | BLUE CROSS & BLUE SHIELD OF FLORIDA |
| Issued by | Executive Risk Specialty Insurance Company |

In consideration of an additional premium of N/A charged:

(1)     The definition of **"Wrongful Act,"** as defined in Section II Definitions (V) of the Policy, is amended to include any actual or alleged act, error or omission in the performance of, or any failure to perform, **Medical Services** by any of the following employed individual(s), but only while such individual(s) is acting within the scope and capacity of his or her duties for the **Named Insured:**

> Employed licensed physicians, licensed physicians' assistants, licensed nurses and other clinical employees while rendering emergency medical and nursing care pursuant to the Insured's disaster recovery plan as long as the aid is rendered without the receipt or expectation of remuneration.

(2)     Section II Definitions (V)(3)(b) of the Policy is amended to read in its entirety as follows:

"(b)     the rendering of, or failure to render, **Medical Services;** provided that **Wrongful Act** shall not include any **Insured's** actual or alleged direct liability for the rendering of, or failure to render, **Medical Services** except to the extent that any such coverage may be afforded pursuant to paragraph (1) of Endorsement No. 10 to the Policy."

(3)     Section III Exclusions (B) of the Policy shall not apply to the individuals and/or activities scheduled in paragraph (1) of this endorsement and shall be deemed to have been amended to the extent necessary to effect the purpose and intent of this endorsement.

(4)     Notwithstanding any provision to the contrary contained herein, no coverage will be available under this Policy for **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any act, error or omission by any individual scheduled in paragraph (1) of this endorsement in the rendering of, or failure to render, **Medical Services** while any such individual's license to practice is or was not active.

(5)     Solely with respect to **Claims** made against the individuals scheduled in paragraph (1) of this endorsement for any act, error or omission in the rendering of, or failure to render, **Medical Services:**

(a)     the Underwriter's maximum limit of liability for each such **Claim** shall be $1,000,000.00, and the Underwriter's maximum aggregate Limit of Liability for all such **Claims** shall be $3,000,000.00, which amounts shall be part of, and not in addition to, the Underwriter's maximum aggregate Limit of Liability set forth in Item 3(a) of the Declarations; and

(b)     Item 4 of the Declarations is amended to read in its entirety as follows:

"ITEM 4.  RETENTION (Subject to Condition IV(A) and inclusive of **Defense Expenses**):

$2,500,000.00 Each **Claim**."

With respect to all other **Claims**, Item 4 of the Declarations shall remain unchanged.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____

Authorized Representative

**ENDORSEMENT NO. 11**
**CLARIFICATION ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

| | |
|---|---|
| Policy No. | 8167-7742 |
| Issued to | BLUE CROSS & BLUE SHIELD OF FLORIDA |
| Issued by | Executive Risk Specialty Insurance Company |

In consideration of the premium charged, no coverage will be available under this Policy for **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error or omission in the performance of, or failure to perform any activities in connection with stop loss or provider excess insurance, reinsurance or self-insurance (collectively, the "Plans") on behalf of any third party that is not an **Insured**, including but not limited to those activities set forth in (a), (b) and (c) below:

(a)     the design, setting of premiums for, or underwriting of any Plan;

(b)     the collection or payment of premiums, commissions, brokerage charges, fees or taxes in connection with any Plan; or

(c)     the submission of claims, if applicable, to the insurer of any such Plan.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Robert Hamburger_

_____
**Authorized Representative**

**ENDORSEMENT NO. 12**
**AMEND EXLUSION (C)(8)(a)(ii) ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

| | |
|---|---|
| Policy No. | 8167-7742 |
| Issued to | BLUE CROSS & BLUE SHIELD OF FLORIDA |
| Issued by | Executive Risk Specialty Insurance Company |

In consideration of the premium charged, Section III Exclusions (C)(8)(a)(ii) of the Policy is amended to read in its entirety as follows:

"(ii)     with respect to which any Insured, as of the Inception Date, knew or should reasonably have known that an Insured would be made a party thereto;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Robert Hamburger*

_____
**Authorized Representative**

ENDORSEMENT NO. 13
AMEND DEFINITION OF "CLAIM" ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

Policy No.      8167-7742
Issued to       BLUE CROSS & BLUE SHIELD OF FLORIDA
Issued by       Executive Risk Specialty Insurance Company

In consideration of the premium charged, Section II Definitions (C) of the Policy is amended to read in its entirety as follows:

"(C)      'Claim' means any written notice received by the risk management department or the corporate legal department of the Named Insured that a person or entity intends to hold an Insured responsible for a Wrongful Act. In clarification and not in limitation of the foregoing, such notice may be in the form of an arbitration, mediation, judicial, declaratory or injunctive proceeding. A Claim will be deemed to be made when such written notice is first received by the risk management department or the corporate legal department of the Named Insured."

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative

ENDORSEMENT NO. 14
AMEND CONDITION (B) ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

Policy No.     8167-7742
Issued to      BLUE CROSS & BLUE SHIELD OF FLORIDA
Issued by      Executive Risk Specialty Insurance Company

In consideration of the premium charged, Section IV Conditions (B) of the Policy is amended to read in its entirety as follows:

"(B)     Reporting of Claims and Circumstances

    (1)     If, during the Policy Period or any applicable Extended Reporting Period, any Claim is first made against any Insured, the risk management department or the corporate legal department of the Named Insured must, as a condition precedent to any right to coverage under this Policy, give the Underwriter written notice of such Claim as soon as practicable thereafter and in no event later than:

        (a)     with respect to a Claim made during the Policy Period, ninety (90) days after the end of the Policy Period; or

        (b)     with respect to a Claim made during an Extended Reporting Period, ninety (90) days after such Claim is first made.

    (2)     If, during the Policy Period, the risk management department or the corporate legal department of the Named Insured first becomes aware of any Wrongful Act, or should have become aware or made aware of a Wrongful Act, which may subsequently give rise to a Claim, and:

        (a)     gives the Underwriter written notice of such Wrongful Act with full particulars as soon as practicable thereafter but in any event before the end of the Policy Period; and

        (b)     requests coverage under this Policy for any Claim subsequently arising from such Wrongful Act as soon as practicable after such Claim is made;

    then any Claim subsequently made against the Insured arising out of such Wrongful Act shall, subject to CONDITION (C) below, be treated as if it had been first made during the Policy Period. The full particulars required in any notice given under (2)(a) above must include, without limitation, a description of the Wrongful Act, the identities of the potential claimants and involved Insureds, the injury or damages which have resulted and/or may result from such Wrongful Act, the manner in which the risk management department or the corporate legal department of the Named Insured first became aware of such Wrongful Act, and the reasons why the risk management department or the corporate legal department of the Named Insured believes the Wrongful Act is likely to result in a Claim being made."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Robert Hamburger_

_____
Authorized Representative

**ENDORSEMENT NO. 15**
**AMEND DEFINITION OF "VICARIOUS LIABILITY" ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

| | |
|---|---|
| Policy No. | 8167-7742 |
| Issued to | BLUE CROSS & BLUE SHIELD OF FLORIDA |
| Issued by | Executive Risk Specialty Insurance Company |

In consideration of the premium charged, the term "Vicarious Liability," as defined in Section II Definitions (U) of the Policy, is amended to read in its entirety as follows:

"(U)    'Vicarious Liability' means liability attributed to any Insured for the acts of a person or entity other than an Insured via any theory of agency, ostensible agency, apparent agency or respondeat superior."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Robert Hamburger_

—————————————————————
Authorized Representative

ENDORSEMENT NO. 16
AMEND DEFINITION OF CLAIM SERVICES ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

Policy No.      8167-7742
Issued to       BLUE CROSS & BLUE SHIELD OF FLORIDA
Issued by       Executive Risk Specialty Insurance Company

In consideration of the premium charged, the term "Claim Services," as defined in Section II Definitions (D) of the Policy, is amended to read in its entirety as follows:

"(D)      'Claim Services' means the following services, but only if performed by an Insured:

    (1)      eligibility determination; and

    (2)      the submission, handling, investigation, payment or adjustment of claims for benefits or coverages

under health care or workers' compensation plans."

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative

ENDORSEMENT NO. 17
AMEND "MANAGED CARE ACTIVITY" ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

> Policy No.    8167-7742
> Issued to    BLUE CROSS & BLUE SHIELD OF FLORIDA
> Issued by    Executive Risk Specialty Insurance Company

In consideration of the premium charged:

(1)    The following term shall have the meaning set forth below and Section II Definitions of the Policy shall be deemed amended to include such term:

"Specific Audits" means audits of statements of reimbursable costs ("cost reports") performed by the Provider Audit and Reimbursement Department (PARD) of the Insured for providers in the State of Florida; provided that such audits are performed on behalf of governmental entities pursuant to the contract between the State of Florida Department of Health and Rehabilitative Services and the Insured (Contract No. LCR76).

(2)    The term "Managed Care Activity," as defined in Section II Definitions (K) of the Policy, is amended to include "Specific Audits."

(3)    No coverage will be available under this Policy for Claims for Wrongful Acts based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Specific Audits performed on or before July 1, 1993.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Robert Hamburger_

_____
Authorized Representative

ENDORSEMENT NO. 18
CLASS ACTION RETENTION ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

| | |
|---|---|
| Policy No. | 8167-7742 |
| Issued to | BLUE CROSS & BLUE SHIELD OF FLORIDA |
| Issued by | Executive Risk Specialty Insurance Company |

In consideration of the premium charged, solely with respect to **Class Action Claims**, as such term is defined in paragraph (5) of this endorsement:

(1)     At such time as the retention amount set forth in paragraph (4) of this endorsement, which shall be borne by the **Insureds** uninsured and at their own risk, has been satisfied, the Underwriter shall pay on behalf of the **Insured** the **Covered Percentage**, as defined in paragraph (2) of this endorsement, of **Loss**, including **Defense Expenses**, from each **Class Action Claim** first made against an **Insured** during the **Policy Period**, or if applicable, the Extended Reporting Period. Any amount of **Loss**, including **Defense Expenses**, in excess of the **Covered Percentage** shall be borne by the **Insureds** uninsured and at their own risk (the "**Insured's Percentage**").

(2)     The term "**Covered Percentage**" means fifty percent (50%).

(3)     The Underwriter's maximum aggregate Limit of Liability for all **Class Action Claims** made against all **Insureds** shall be $10,000,000.00 (the "**Class Action Claims Sublimit**") which amount shall be part of, and not in addition to, the Underwriter's maximum aggregate Limit of Liability set forth in Item 3(a) of the Declarations which is applicable to all **Claims** for which this Policy provides coverage.

(4)     Solely with respect to **Class Action Claims**, Item 4 of the Declarations is amended to read in its entirety as follows:

ITEM 4.  RETENTION (Subject to Condition IV(A) and applicable to **Defense Expenses**):

$2,500,000.00 each **Class Action Claim**.

With respect to all other **Claims**, Item 4 of the Declarations shall remain unchanged.

(5)     For the purpose of this endorsement, the term "**Class Action Claim**" means any **Claim**:

(a)     brought or filed originally as, or amended at any time seeking certification as a class action whether or not such action is actually certified; or

(b)     brought by or on behalf of any association or group, including but not limited to, societies, trade groups, professional groups, consumer advocates or advocacy groups, whether such **Claim** is brought in the name of such association or group or by such association or group on behalf of one or more constituent individual(s) or entity(ies).

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____

Authorized Representative

ENDORSEMENT NO. 19
DELETE AN ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

| | |
|---|---|
| Policy No. | 8167-7742 |
| Issued to | BLUE CROSS & BLUE SHIELD OF FLORIDA |
| Issued by | Executive Risk Specialty Insurance Company |

In consideration of the premium charged, Endorsement No. #3 (D22985,4/96) is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Robert Hamburger_

_____
Authorized Representative

## ENDORSEMENT NO. 20
## DELETE AN ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

      Policy No.     8167-7742
      Issued to     BLUE CROSS & BLUE SHIELD OF FLORIDA
      Issued by     Executive Risk Specialty Insurance Company

In consideration of the premium charged, Endorsement No. #18 (QBCBSFL7,11/2002) is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Robert Hamburger*

——————————————————
Authorized Representative

ENDORSEMENT NO. 21
SCHEDULE A -- ADDITIONAL INSURED ENTITIES

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

Policy No.        8167-7742
Issued to         BLUE CROSS & BLUE SHIELD OF FLORIDA
Issued by         Executive Risk Specialty Insurance Company

In consideration of the premium charged, the term "Insured Entity" will also include the following:

Health Options, Inc.
Comp Options Insurance Co., Inc.
First Coast Health Services Options, Inc.
Florida Combined Life Insurance Company, Inc.
Florida Combined Life Insurance Agency,Inc.
Health Options Diversified, Inc.
Navigy Holdings, Inc.
Navigy, Inc.
Diversified Services Options, Inc.
Diversified Health Services, Inc.
Capital Group Health Services of Florida, Inc.
Incepture, Inc
Health Options Connect, Inc.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Robert Hamburger_

———————————————————
Authorized Representative

ENDORSEMENT NO. 22
AMEND ITEM 1 ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

Policy No.    8167-7742
Issued to     BLUE CROSS & BLUE SHIELD OF FLORIDA
Issued by     Executive Risk Specialty Insurance Company

In consideration of the premium charged, Item 1 of the Declarations is amended in its entirety as follows:

Item 1.    Named Insured – Name and Principal Address:

Blue Cross & Blue Shield of Florida
4800 DEARWOOD CAMPUS PARKWAY,
DC 1-7
Jacksonville, FL 32246

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

ENDORSEMENT NO. 23
CLASS ACTION RETENTION ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on November 1, 2002, forms part of

Policy No.    8167-7742
Issued to     BLUE CROSS & BLUE SHIELD OF FLORIDA
Issued by     Executive Risk Specialty Insurance Company

In consideration of the premium charged, solely with respect to **Class Action Claims**, as such term is defined in paragraph (5) of this endorsement:

(1)    At such time as the retention amount set forth in paragraph (4) of this endorsement, which shall be borne by the **Insureds** uninsured and at their own risk, has been satisfied, the Underwriter shall pay on behalf of the **Insured** the **Covered Percentage**, as defined in paragraph (2) of this endorsement, of **Loss**, including **Defense Expenses**, from each **Class Action Claim** first made against an **Insured** during the **Policy Period**, or if applicable, the Extended Reporting Period. Any amount of **Loss**, including **Defense Expenses**, in excess of the **Covered Percentage** shall be borne by the **Insureds** uninsured and at their own risk (the "**Insured's Percentage**").

(2)    The term "**Covered Percentage**" means fifty percent (50%).

(3)    The Underwriter's maximum aggregate Limit of Liability for all **Class Action Claims** made against all **Insureds** shall be $10,000,000.00 (the "**Class Action Claims Sublimit**") which amount shall be part of, and not in addition to, the Underwriter's maximum aggregate Limit of Liability set forth in Item 3(a) of the Declarations which is applicable to all **Claims** for which this Policy provides coverage.

(4)    Solely with respect to **Class Action Claims**, Item 4 of the Declarations is amended to read in its entirety as follows:

ITEM 4.   RETENTION (Subject to Condition IV(A) and applicable to **Defense Expenses**):

$$3,000,000.00 each **Class Action Claim**.

With respect to all other **Claims**, Item 4 of the Declarations shall remain unchanged.

(5)    For the purpose of this endorsement, the term "**Class Action Claim**" means any **Claim**:

(a)    brought or filed originally as, or amended at any time seeking certification as a class action whether or not such action is actually certified; or

(b)    brought by or on behalf of any association or group, including but not limited to, societies, trade groups, professional groups, consumer advocates or advocacy groups, whether such **Claim** is brought in the name of such association or group or by such association or group on behalf of one or more constituent individual(s) or entity(ies).

All other terms, conditions and limitations of this Policy shall remain unchanged.

_Robert Hamburger_

_____

Authorized Representative